RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 20a0197p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

ERVINE LEE DAVENPORT,

　　　　　　　　　　*Petitioner-Appellant*,

*v.*

No. 17-2267

DUNCAN MACLAREN, Warden,

　　　　　　　　　　*Respondent-Appellee*.

─────────────

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:14-cv-01012—Ellen S. Carmody, Magistrate Judge.

Argued: May 7, 2019

Decided and Filed: June 30, 2020

Before: COLE, Chief Judge; STRANCH and READLER, Circuit Judges.

─────────────

## COUNSEL

**ARGUED:** Tasha J. Bahal, WILMER CUTLER PICKERING HALE AND DORR LLP, Boston, Massachusetts, for Appellant. Jared D. Schultz, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee. **ON BRIEF:** Tasha J. Bahal, Reuven Dashevsky, WILMER CUTLER PICKERING HALE AND DORR LLP, Boston, Massachusetts, for Appellant. Aaron D. Lindstrom, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee.

　　　　STRANCH, J., delivered the opinion of the court in which COLE, C.J., joined. READLER, J. (pp. 26–46), delivered a separate dissenting opinion.

---

**OPINION**

---

JANE B. STRANCH, Circuit Judge. Ervine Lee Davenport was convicted of first-degree murder after a jury trial in Michigan state court. He challenges his conviction in a habeas corpus petition under 28 U.S.C. § 2254 because he was visibly shackled at the waist, wrist, and ankles during trial. The State of Michigan admits Davenport's shackling was unconstitutional but argues that the habeas petition should be denied because this error was harmless. The district court agreed it was harmless error and denied the petition. Because "shackling is 'inherently prejudicial,'" *Deck v. Missouri*, 544 U.S. 622, 635 (2005) (quoting *Holbrook v. Flynn*, 475 U.S. 560, 568 (1986)), and the evidence of premeditation and deliberation necessary to a first-degree murder conviction was not overwhelming, the State has not met its burden to show the restraints did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). We therefore **REVERSE** the judgment of the district court, **GRANT** Davenport a conditional writ of habeas corpus, and **REMAND** the case for further proceedings.

## I. BACKGROUND

### A. The Trial

Davenport killed Annette White in the early hours of January 13, 2007. At his 2008 trial, he testified that he had been drinking beer and smoking crack cocaine with White and some friends when White was asked to leave her friends' house due to her aggressive behavior. According to Davenport's testimony, he tried to calm her down as he drove her home. While he drove, she was saying that she was hot and taking off her clothes. She demanded that he take her to a specific apartment building and tried to grab the steering wheel. Each time she tried to grab the wheel, Davenport pushed her back. She then started yelling and kicking and pulled out a boxcutter, which she swung at Davenport, cutting his arm. Davenport testified that he was afraid of the knife and trying to avoid oncoming traffic. As he continued to drive, Davenport pinned her against the side of the car with his fully extended hand pressed against her neck. Right as he

was about to let up, she scratched him on the face, and he "pinned her back up against the other side of the car." At some point, he noticed that she was no longer struggling; initially, he thought that she had calmed down or passed out but then he realized she was not breathing. He panicked and left her partially clothed body in a field. He testified that he was not sure how long he held White back by the throat but that it "seemed like . . . everything happened fast."

Some of this testimony was corroborated by other evidence at trial. Medical evidence established that White had consumed a substantial amount of alcohol and crack cocaine shortly before her death. An independent witness also testified that he had consumed beer and crack cocaine with Davenport and White that night. This witness further testified that he asked White to leave at about 2:30 a.m. that morning because she was acting "agitated" and "getting crazy." She was "ranting and raving," though he would not describe her as "violent." Other witnesses testified that White would get angry when she smoked crack cocaine, and that she was "a spitfire" who had a reputation for fighting.

But medical evidence seemingly contradicted other aspects of Davenport's testimony. A forensic pathologist, Dr. Brian Hunter, testified that although it would take 30 seconds to cut someone's air off sufficiently to cause them to pass out, it would take at least four to five minutes to suffocate someone to death. Dr. Hunter also testified in rebuttal that the injuries to White were not consistent with Davenport's testimony that he did not choke White and instead "his hand was flexed and that all he was doing was pushing her against the door." Dr. Hunter explained that the injuries to either side of White's neck, but not the middle, were "more consistent with choking than . . . broad pressure there."

The prosecution also presented testimony that Davenport had strangled another woman until she was unconscious less than a week before White's death. Another witness testified that Davenport had told him a couple of times that "if things got out of hand," he would choke people. Davenport told this same witness that White "kept coming back at him and it just got out of hand, and that's when he offed her."

In its closing, the defense argued that this was a case of self-defense. In contrast, after giving 17 reasons why Davenport's "'self-defense' claim was bogus,"[1] the prosecution claimed that "[t]he only real issue is whether it's first-degree" or second-degree murder. The only support for premeditation and deliberation the prosecution gave in its closing statement was the length of time it would take to choke someone to death. The prosecutor claimed, "[c]learly he had the opportunity to hesitate, stop, think about what he was doing, and not kill her. I submit to you there's more than enough evidence of premeditation and deliberation for first-degree murder, but at the very least obviously this is second-degree murder." After deliberating for six hours over the course of two days, the jury found Davenport guilty of first-degree murder.

During the trial, Davenport had one hand cuffed, as well as shackles around his waist and ankles. The trial judge allowed "his right hand to be uncuffed so he could write notes to his counsel." The judge also noted that there was a privacy curtain around the defense table. Defense counsel referred to the "[c]ourt's policy regarding the shackles," but there was no on-the-record justification given for the shackling.

## B. The State Court Appeals and Evidentiary Hearing

On direct appeal, Davenport raised several issues, including that "he was denied his due process rights when the trial court required him to wear shackles during the trial." *People v. Davenport*, Docket No. 287767, 2010 WL 3062279, at *1 (Mich. Ct. App. Aug. 5, 2010). The Michigan Court of Appeals found that this issue was unpreserved. *Id.* Reviewing it for plain error, the court found that "it was error for the trial court to order defendant to be restrained without making the requisite findings," but that Davenport had "not shown that his restraints were visible to the jury" and thus had "not demonstrated prejudice." *Id.* at *1–2. The Michigan Supreme Court reversed, finding that this issue was preserved[2] and remanding the case to the trial court for an evidentiary hearing. *People v. Davenport*, 794 N.W.2d 616 (Mich. 2011). The

---

[1]These reasons included, among others, that Davenport dumped White's body in the woods instead of calling 911, initially lied to the police, weighed almost three times as much as the victim, and stole some of White's property after killing her.

[2]During jury selection, defense counsel asked that Davenport's handcuff be removed because, "given the circumstances, the testimony, the evidence I believe is going to be presented, I don't want the jurors to be unduly influenced and fearful of Mr. Davenport."

Michigan Supreme Court directed the trial court to determine whether "the jury saw the defendant's shackles" and, if so, "whether the prosecution can demonstrate beyond a reasonable doubt that the shackling error did not contribute to the verdict against the defendant." *Id.* (citing *Deck*, 544 U.S. at 635).

The trial court subsequently held an evidentiary hearing where all 12 jurors testified. This evidentiary hearing was held on June 24 and July 29, 2011, approximately three years after the trial. Five jurors testified that they saw Davenport's waist chain, handcuffs, or ankle shackles at some point during jury selection or the trial. Two other jurors testified that they recalled comments by other jurors about Davenport's shackles. One juror could not remember whether she saw the shackles. The remaining four jurors testified that they did not notice or hear about Davenport's restraints during the trial.

Several jurors recalled at the evidentiary hearing that they had thought Davenport might be dangerous when they saw him in shackles. Another juror recalled that she was sitting closest to Davenport when he testified and a fellow juror had asked her if that made her nervous. She also recalled that there were more guards when Davenport testified because he was not in shackles. But the jurors who testified that they saw Davenport's shackles also all said that they believed shackling was routine practice given that he was on trial for murder or because he was in pre-trial incarceration.[3] Every juror asked also testified that Davenport's shackling did not affect their deliberations.

After this hearing, the trial court issued an opinion ruling that, although some of the jurors saw Davenport's shackles, the prosecution had proved beyond a reasonable doubt that the shackling did not affect the jury's verdict. The trial court focused on the jurors' testimony that Davenport's shackling was not discussed during deliberations and did not affect their verdict. It also relied on the jurors' testimony that they viewed the shackling as a routine security procedure. The Michigan Court of Appeals affirmed, holding that "[t]he trial court did not err in finding that the prosecution proved beyond a reasonable doubt that the shackling error did not affect the verdict." *People v. Davenport*, Docket No. 306868, 2012 WL 6217134, at *3 (Mich.

---

[3]Davenport wore an orange jail jumpsuit on the first day of trial, during jury selection. He wore dress clothes for the rest of the trial. He does not raise any issues relating to his attire on appeal.

Ct. App. Dec. 13, 2012).  The Michigan Supreme Court denied leave to appeal.  *People v. Davenport*, 832 N.W.2d 389, 390 (Mich. 2013).  It stated that, although "the Court of Appeals erroneously failed to consider defendant's claim in light of the United States Supreme Court decision in *Holbrook v. Flynn* . . . , the error was harmless under the facts of this case.  Given the substantial evidence of guilt presented at trial, we cannot conclude that there was an unacceptable risk of impermissible factors coming into play." *Id.*

## C.  The § 2254 Petition

Davenport next filed a timely petition for a writ of habeas corpus under 28 U.S.C. § 2254, raising a single issue—his shackling.  After the State of Michigan responded to this § 2254 petition, the magistrate judge issued a Report and Recommendation (R&R) that the petition be denied.  The magistrate judge found that "it was completely reasonable for the jury to reject Petitioner's claim of self-defense and to instead find that Petitioner committed first degree murder."  Thus, the magistrate judge concluded that the state courts' determination "that the prosecution had demonstrated beyond a reasonable doubt that [Davenport's shackling] did not contribute to the jury's guilty verdict" was "neither contrary to, nor involve[d] an unreasonable application of, clearly established federal law."  The district court overruled Davenport's objections and adopted the R&R in its entirety, denying the petition and a certificate of appealability.

Davenport, now proceeding pro se, applied to this court for a certificate of appealability. We granted him a certificate of appealability and appointed counsel.  This appeal followed.

## II.  ANALYSIS

### A.  Standard of Review

We "review the decision of a district court to grant or deny a writ of habeas corpus *de novo*" and "review factual findings by that court for clear error, except where the district court has made factual determinations based on its review of . . . court records; in such cases we review such findings *de novo*." *Ruimveld v. Birkett*, 404 F.3d 1006, 1010 (6th Cir. 2005).

There is a dispute, however, about what standard applies on habeas review when determining whether Davenport's unconstitutional shackling was harmless error. The State argues that our review must entail two separate determinations. First, we must find that the state court's conclusion that the shackling was harmless beyond a reasonable doubt "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d). And, second, we must find that the shackling had a "substantial and injurious effect or influence in determining the jury's verdict." The former is the familiar test required by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). *See, e.g.*, *Mitchell v. Esparza*, 540 U.S. 12, 18 (2003) ("[H]abeas relief is appropriate only if the [state court] applied harmless-error review in an 'objectively unreasonable' manner." (quoting *Lockyer v. Andrade*, 538 U.S. 63, 75–77 (2003))). The latter is the prejudice standard that habeas petitioners complaining of trial error are required to meet. *See Brecht*, 507 U.S. at 623, 637. Davenport, on the other hand, argues that the only question before this court is whether the shackling "had substantial and injurious effect or influence in determining the jury's verdict," *id.* at 637, because the *Brecht* standard "'subsumes'" AEDPA's unreasonableness inquiry. *Davis v. Ayala*, 135 S. Ct. 2187, 2198–99 (2015) (citing *Fry v. Pliler*, 551 U.S. 112, 119–20 (2007)).

Binding precedent resolves the issue. "The answer in this Circuit is that *Brecht* is always the test, and there is no reason to ask both whether the state court 'unreasonably' applied *Chapman*[4] under the AEDPA and, further, whether the constitutional error had a 'substantial and injurious' effect on the jury's verdict." *Ruelas v. Wolfenbarger*, 580 F.3d 403, 412 (6th Cir. 2009). We adopted this conclusion from the Supreme Court's statement that it "makes no sense to require formal application of both tests (AEDPA/*Chapman* and *Brecht*) when the latter obviously subsumes the former." *Id.* (quoting *Fry*, 551 U.S. at 120); *see Reiner v. Woods*, 955 F.3d 549, 556 (6th Cir. 2020) ("The Supreme Court and this court have made clear that '*Brecht* is always the test' for evaluating harmless error on collateral review, even where AEDPA applies.").

---

[4]*Chapman v. California*, 386 U.S. 18 (1967) (holding that, on direct appeal, the prosecution has the burden of proving beyond a reasonable doubt that a federal constitutional error was harmless).

The dissent suggests that *Ruelas* and its progeny are called into question by the Supreme Court's decision in *Davis v. Ayala*, 135 S. Ct. 2187. *Ayala*, however, noted that while a habeas petitioner's obligation to meet the *Brecht* standard "does not mean . . . that a state court's harmlessness determination has no significance under *Brecht*," it further explained that though AEDPA remains a precondition to habeas relief, both the *Brecht* and AEDPA/*Chapman* tests need not be applied. *Id.* at 2198; *see also Fry*, 551 U.S. at 119–20. The Supreme Court concluded that applying *Brecht* alone is appropriate because "the *Brecht* test subsumes the limitations imposed by AEDPA." *Id.* at 2199 (citing *Fry*, 551 U.S. at 119–20). *Ruelas* relied on that precedential conclusion, explaining that though *Brecht* "handles the work" of both tests, a federal "habeas court remains free to, before turning to *Brecht*, inquire whether the state court's *Chapman* analysis was reasonable. If it was reasonable, the case is over. But . . . a habeas court may [also] go straight to *Brecht* with full confidence that the AEDPA's stringent standards will also be satisfied." *Ruelas*, 580 F.3d at 412–13.

In fact, we have already concluded that *Ruelas* and *Ayala* are consistent: "*Ruelas*, which has not been affected by *Ayala*, . . . clearly announc[es] that in the Sixth Circuit on habeas review we always apply *Brecht* and need not also apply AEDPA/*Chapman*." *O'Neal v. Balcarcel*, 933 F.3d 618, 625 (6th Cir. 2019). In *Reiner*, we explained that while "[t]he state argues that the Supreme Court's subsequent decision in *Davis v. Ayala* changed this dynamic . . . [t]he problem for the state is that our precedent forecloses this approach." 955 F.3d at 556–57; *see also McCarley v. Kelly*, 801 F.3d 652, 665 (6th Cir. 2015) (citing to both *Ruelas* and *Ayala* for the applicable standard); *Sheard v. Klee*, 692 F. App'x 780, 786 (6th Cir. 2017) ("Although *Brecht* is a pre-AEDPA case, the Supreme Court has subsequently held that the *Brecht* test 'subsumes' the AEDPA requirements such that a formal application of both tests is unnecessary." (quoting *Fry*, 551 U.S. at 120)). We have again recently said, not that two tests must be performed, but that the proper test contains "a choice of prompts;" in which one "option—a shortcut of sorts—is to leapfrog AEDPA and jump directly to *Brecht*." *Hollman v. Sprader*, 803 F. App'x 841, 843 (6th Cir. 2020) (citing *Ayala*, 135 S. Ct. at 2198–99).

The dissent supposes that our quotation from *Reiner* unfairly masks its holding. Dissent at 34. But *Reiner* expressly holds that the "Supreme Court and this court have made clear that

'*Brecht* is always the test.'" 955 F.3d at 556. *Reiner* is merely a recent installment in an ongoing chain of binding precedent that has sought to provide clarity to the relationship between AEDPA and *Brecht*—an issue that has preoccupied appellate courts and caused "consternation" among the lower courts since AEDPA was passed. *Ruelas*, 580 F.3d at 412–13; *see also* 2 R. Hertz & J. Liebman, *Federal Habeas Corpus Practice and Procedure* § 31.1 (7th ed. 2019). There is no nefarious ellipsis plot to paint over the *Reiner* court's recognition of the State's argument. Simply put, where the Supreme Court has stepped in to provide clarity—as it did in *Fry* and again in *Ayala*—we are obliged to follow it. And here that clarifying law includes *Ayala*'s holding that where a habeas petitioner can succeed under the more demanding *Brecht* test, the state court's "harmlessness determination itself is unreasonable," which shows that both tests are satisfied. 135 S. Ct. at 2199.

Faced with unambiguous precedent from both the Supreme Court and our circuit, the dissent next turns to challenges to timing, and word-splitting. First it contends that *Brecht* could not have functionally subsumed the AEDPA test because AEDPA was "still in the mind's eye" when *Brecht* was decided. Dissent at 35. But, as noted above, the Supreme Court set out its holding that the *Brecht* test subsumed AEDPA *after* AEDPA was enacted. We are bound by its interpretation of AEDPA's requirements. The dissent then challenges the meaning of the words used by the Supreme Court, contending that the Court held the *Brecht* test "subsumes" the AEDPA analysis but not that the *Brecht* test "consumes" the AEDPA analysis. Dissent at 35. This is word play. *Black's Law Dictionary* defines "subsume" as a verb that means "[t]o judge as a particular instance governed by a general principle; to bring (a case) under a broad rule." *Subsume*, Black's Law Dictionary (11th ed. 2019). "Consume" is a verb for which *Black's* offers five definitions, none of which apply to the question we face today.[5] These definitions evidence the dissent's underlying conceptual error. It uses the word "consumes" to assert that AEDPA's requirements have been improperly eliminated. But the Supreme Court selects its

---

[5]"(1) To destroy the substance of, esp. by fire; to use up or wear out gradually, as by burning or eating <the house was consumed by fire>. (2) To expend wastefully; to waste; to squander <he consumed all his resources within four months>. (3) To use up (time, resources, etc.), whether fruitfully or fruitlessly <45% of the paper we consume is recycled>. (4) To eat or drink; to devour <no alcohol may be consumed on these premises>. (5) To engage the attention or interest of fully; to obsess <she was consumed with guilt after her father's death>." *Consume*, Black's Law Dictionary (11th ed. 2019).

words and it chose "subsumes"—a word routinely used in law to describe the interplay between legal standards—to show that the *Brecht* test satisfies AEDPA's requirements, not eliminates them. We are bound to accept that choice and apply that word here. A habeas petitioner therefore "must satisfy *Brecht*, and if the state court adjudicated his claim on the merits, the *Brecht* test subsumes the limitations imposed by AEDPA." *Ayala*, 135 S. Ct. at 2199. "[A] federal habeas court need not 'formal[ly]' apply both *Brecht* and "AEDPA/*Chapman*." *Id.* at 2198 (quoting *Fry*, 551 U.S. at 119–20) (second alteration in original).

The dissent's assertion that our *Brecht*-only framework jettisons the required AEDPA test is based on a misunderstanding—it conflates the habeas test that applies to an underlying constitutional error with the test that governs the harmlessness of that error. It relies chiefly on *Yarborough v. Alvarado*, 541 U.S. 652 (2004) and *Mendoza v. Berghuis*, 544 F.3d 650, 655 (6th Cir. 2008) for its failure-to-satisfy AEDPA claim but those cases concerned whether there was an underlying constitutional error at the petitioners' trials. That question, of course, requires asking whether the state court's constitutional analysis "was contrary to, or involved an unreasonable application of, clearly established Federal law," § 2254(d), before turning to *Brecht*. Here, however, that question need not be asked because the State concedes that Davenport's shackling was constitutional error.

In fact, this concession neatly reveals the crux of the dissent's confusion. It supposes that this opinion seeks to lay blame on the State for conceding "away AEDPA review of the Michigan courts' harmless error determination." Dissent at 36. Had the State made that issue-concluding concession, there would be no need to dispute the review standard. What the State conceded, unlike the cases on which the dissent relies, is *the underlying constitutional error*. It bears repeating—when there is a dispute over whether a *constitutional error* occurred, of course we would apply § 2254(d)'s "contrary to or . . . unreasonable application" of federal law test. But the State here concedes constitutional error. That is what makes this case unusual and is the reason that we can go straight to *Brecht*. The dissent's confusion about what was conceded undergirds its misunderstanding of this majority opinion.

Providing a list of cases, the dissent asserts that we stand alone in applying a *Brecht*-only test and that all other federal circuits addressing the issue "have granted AEDPA deference to a

state court's determination that a constitutional error was harmless," thus applying both *Brecht* and AEDPA.  Dissent at 36–37.    This statement illustrates the dissent's confusion.  Not a single case on the dissent's list contains a habeas petitioner who prevailed under *Brecht*'s harmlessness inquiry and was then required to pass through the gauntlet of a second harmlessness test. *Orlando v. Nassau Cty. Dist. Attorney's Office*, 915 F.3d 113, 127 (2d Cir. 2019) (no state court harmlessness determination; *Brecht*-only applied);  *Johnson v. Lamas*, 850 F.3d 119, 137 (3d Cir. 2017) (petitioner failed to meet AEDPA test, therefore "necessarily cannot satisfy" *Brecht* (quoting *Ayala*, 135 S. Ct. 2199));  *Long v. Pfister*, 874 F.3d 544, 547 (7th Cir. 2017) (en banc) (faulting the original panel for failing to "apply the standard of *Brecht*" to its finding of constitutional error but reviewing only the constitutional holding below);  *Davis v. Grandienard*, 828 F.3d 658, 666 (8th Cir. 2016) (petitioner failed to meet AEDPA test, no *Brecht* analysis); *Rademaker v. Paramo*, 835 F.3d 1018, 1024 (9th Cir. 2016) (petitioner failed to meet AEDPA test, therefore "necessarily cannot satisfy" *Brecht* (quoting *Ayala*, 135 S. Ct. 2199));  *Malone v. Carpenter*, 911 F.3d 1022, 1030 (10th Cir. 2018) (petitioner failed to meet AEDPA test, alternatively failed to meet *Brecht*);  *Al-Amin v. Warden*, 932 F.3d 1291, 1299 (11th Cir. 2019) (petitioner failed *Brecht*-only test).

The dissent's analytical error is perhaps best captured by its parallel citation to *Sifuentes v. Brazelton*, for the proposition that the Ninth Circuit rejects our court's *Brecht*-only framework. 825 F.3d 506, 534 (9th Cir. 2016).  *Sifuentes* notes that AEDPA applies to the harmlessness assessment even after *Ayala*, and then explains how the Ninth Circuit's harmless error analysis works—the same way as ours:

> In sum, a petitioner "necessarily cannot satisfy" the *Brecht* requirement of showing that he was "actually prejudiced" by the state court's error . . . "if a fairminded jurist could agree with the [state appellate court] that this procedure met the *Chapman* standard of harmlessness." [*Ayala*, 135 S. Ct.] at 2199.  By the same token, if a petitioner does satisfy the *Brecht* requirement of showing that an error resulted in "actual prejudice," then the petitioner necessarily must have shown that the state court's determination that the error was harmless was objectively unreasonable.

*Id.* at 535.

There is no dispute that both *Brecht* and AEDPA must be satisfied for a habeas petitioner to show that a constitutional error was not harmless. The Supreme Court's statement in *Fry* that the *Brecht* test subsumes the limitations imposed by AEDPA and our acknowledgment in *Ruelas* that the *Brecht* test handles the work of both tests show that our test accomplishes that principle. The critical point missed in the dissent's analysis is that in the harmless error context, it is significantly harder for a habeas petitioner to meet *Brecht*'s actual prejudice standard than *Chapman*'s defendant-friendly standard or, in other words, easier for the State to prevail under *Brecht* than under AEDPA/*Chapman*. So much so that where a state court finds an error harmless under *Chapman* and the defendant is later able to surmount the imposing *Brecht* hurdle, the state court's *Chapman* analysis (even though insulated by AEDPA deference) is necessarily objectively unreasonable under *Harrington v. Richter*, 562 U.S. 86, 103 (2011). *See Ayala*, 135 S. Ct. at 2198–99. The tests of *Brecht* and AEDPA/*Chapman* then both seek traces of the same poison but *Brecht*'s test covers both because it requires the petitioner to show enough poison to be fatal under either test.[6] This is why the Court in *Ayala* held that "[i]n sum, a prisoner who seeks federal habeas corpus relief must satisfy *Brecht,* and if the state court adjudicated his claim on the merits, the *Brecht* test subsumes the limitations imposed by AEDPA." *Ayala*, 135 S. Ct. at 2199. This standard of review, moreover, was a point of agreement among the Justices in *Ayala*.[7] As a result, even though *Brecht* predated AEDPA, a

---

[6]This makes sense because *Brecht* intended to place a higher burden on a habeas petitioner at collateral review than on direct appeal. 507 U.S. at 637. As the dissent correctly notes, the habeas petitioner in *Fry* argued for the AEDPA/*Chapman* test (instead of *Brecht's*) because it would have lowered his burden. Dissent at 31–32. The dissent is correct that AEDPA did not make relief more available to petitioners, but it overlooks the *Fry* Court's rationale that *Brecht* is the test because AEDPA did not intend to lower the burden on petitioners and *Brecht* is harder on petitioners than AEDPA/*Chapman*. *Fry*, 551 U.S. at 119–20. The point stands that the AEDPA/*Chapman* test is easier. "[I]t is implausible that, without saying so, AEDPA replaced the *Brecht* standard . . . with the more liberal AEDPA/*Chapman* standard." *Id.*

[7]In her dissent in *Ayala*, Justice Sotomayor explained:

My disagreement with the Court does not stem from its discussion of the applicable standard of review, which simply restates the holding of *Fry*. *Fry* rejected the argument that [AEDPA] compels federal courts to apply any standard other than that set forth in *Brecht*, when assessing the harmlessness of a constitutional error on habeas review. . . . In addition to confirming the *Brecht* standard's continued vitality, *Fry* established its exclusivity. *Fry* expressly held that federal habeas courts need not first assess whether a state court unreasonably applied *Chapman* before deciding whether that error was prejudicial under *Brecht*. Such a requirement would "make no sense when the latter standard obviously subsumes the former." Nothing in the Court's opinion today calls into question this aspect of *Fry*'s holding. If a trial error is prejudicial under *Brecht*'s

habeas court may choose to start with *Brecht* because AEDPA deference may be exacted through *Brecht*'s demanding standard. *Id.* at 2199. *Brecht*, moreover, not only contains AEDPA's stringent commands of deference to state court merit determinations but also its spirit of federalism, comity, and finality.[8] *Fry*, 551 U.S. at 116. We therefore turn to the question of whether Davenport's shackling had a "substantial and injurious effect or influence" on the jury's verdict. *See Brecht*, 507 U.S. at 637.

## B. The Law of Shackling

"The law has long forbidden routine use of visible shackles during the guilt phase" of a criminal trial. *Deck*, 544 U.S. at 626. After discussing the roots of this precept in the common law, *Deck* summarized the near-universal consensus of lower courts and commentators that "a criminal defendant has a right to remain free of physical restraints that are visible to the jury; that the right has a constitutional dimension; but that the right may be overcome in a particular instance by essential state interests such as physical security, escape prevention, or courtroom decorum." *Id.* at 628. The Supreme Court concluded, "the Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial." *Id.* at 629.

---

standard, a state court's determination that the error was harmless beyond a reasonable doubt is necessarily unreasonable.

*Ayala*, 135 S. Ct. at 2211 (Sotomayor, J., dissenting) (quoting *Fry*, 551 U.S. at 120) (brackets and citations omitted). *See also Jimerson v. Payne*, 957 F.3d 916, 929–30 (8th Cir. 2020) (adopting Justice Sotomayor's rule statement for the harmlessness inquiry). This shows that the presence of the Eighth Circuit on the dissent's list of circuits that require application of two tests is another mistaken entry.

[8]In fact, counter to the dissent's assertion that *Brecht* only does the work of AEDPA/*Chapman* where there was no *Chapman* analysis by the state court, dissent at 34–35, *Fry* held that precisely because *Brecht* performs the work of "finality, comity, and federalism. . . . *Brecht*'s applicability does not turn on whether the state appellate court recognized the constitutional error and reached the *Chapman* question." *Fry*, 551 U.S. at 117–18 ("[These] weighty reasons given in *Brecht* for applying a less onerous standard [on the State] on collateral review . . . hav[e] nothing to do with whether the state court actually applied *Chapman*."). Therefore, "[i]n this Circuit, *Brecht* is the standard for reviewing all (non-structural) errors on collateral review; it applies whether or not the state appellate courts recognized the error." *Ruelas*, 580 F.3d at 411. *Ayala*, moreover, makes clear that *Fry*'s holding that *Brecht* subsumes AEDPA deference, applies even where there is a harmless error determination by the state court. 135 S. Ct. at 2199.

This right is rooted in "three fundamental legal principles." *Id.* at 630. First is the presumption of innocence, which "lies at the foundation of the administration of our criminal law." *Id.* (quoting *Coffin v. United States*, 156 U.S. 432, 453 (1895)). "Visible shackling undermines the presumption of innocence and the related fairness of the factfinding process. It suggests to the jury that the justice system itself sees a 'need to separate a defendant from the community at large.'" *Id.* (quoting *Holbrook*, 475 U.S. at 569) (citation omitted). Second is the right to counsel: "Shackles can interfere with the accused's 'ability to communicate with his lawyer'" and his "ability to participate in his own defense." *Id.* at 631 (quoting *Illinois v. Allen*, 397 U.S. 337, 344 (1970) (citations omitted). Finally, there is the need to preserve the integrity of the judicial process. *Id.* "[T]he use of shackles at trial 'affront[s]' the 'dignity and decorum of judicial proceedings that the judge is seeking to uphold.'" *Id.* (second alteration in original) (quoting *Allen*, 397 U.S. at 344).

For these reasons, "shackling is 'inherently prejudicial.'" *Id.* at 635 (quoting *Holbrook*, 475 U.S. at 568). "Thus, where a court, without adequate justification, orders the defendant to wear shackles that will be seen by the jury," the defendant's due process rights are violated. *Id.* Here, the State of Michigan does not dispute that there was no on-the-record justification for the shackling and therefore it was unconstitutional. The State argues instead that this error was harmless under the standards applicable on habeas review.

Certainly, Davenport is not entitled to habeas relief simply because he was unconstitutionally shackled. As noted above, we must also find that the shackling error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637. Habeas petitioners "are not entitled to habeas relief based on trial error unless . . . it resulted in 'actual prejudice.'" *Id.* But "[t]he inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence [on the jury's decision]. If so, *or if one is left in grave doubt,* the conviction cannot stand." *McCarley*, 801 F.3d at 665 (quoting *O'Neal*, 513 U.S. at 438) (emphasis in original). The State "has the burden of proof in this analysis." *Stumpf v. Robinson*, 722 F.3d 739, 752 (6th Cir. 2013) (en banc); *see also Rosencrantz v. Lafler*, 568 F.3d 577, 590 (6th Cir. 2009) (Under *Brecht*, "[t]he state bears responsibility for showing

that the error had no effect on the verdict."). "Where things are 'evenly balanced,' *O'Neal* instructs that the state bears the 'risk of equipoise.'" *Reiner*, 955 F.3d at 556 (first quoting *O'Neal*, 513 U.S. at 435) (citation omitted).

The high bar of actual prejudice highlights the error in the dissent's claim that our Circuit's *Brecht*-only framework "pays no respect" to our sister state courts and "sets us apart from every other circuit court to have addressed" harmless error issues in habeas. Dissent at 39. The dissent's inclusion of the Ninth Circuit on its list again illustrates its misunderstanding. The Ninth Circuit recently held that "[t]he *Brecht* standard is so stringent that it 'subsumes' the AEDPA/*Chapman* standard for review of a state court determination of the harmlessness of a constitutional violation. We need not apply both a *Brecht* review and an AEDPA/*Chapman* review because 'a determination that the error resulted in 'actual prejudice' under *Brecht* necessarily means that the state court's harmless error determination was not merely incorrect, but objectively unreasonable.'" *Hall v. Haws*, 861 F.3d 977, 992 (9th Cir. 2017) (quoting *Deck v. Jenkins*, 814 F.3d 954, 985 (9th Cir. 2016) (brackets and citations omitted)).

*Hall* shows again that the dissent's list of circuit cases applying AEDPA/*Chapman* merely supports the undisputed conclusion that courts may choose to perform harmless error analysis under AEDPA/*Chapman* first, before turning to *Brecht*'s more onerous inquiry, if necessary. The list does not support the requirement of "two separate conclusions" that "the courts of appeals have universally accepted," dissent at 39, nor does it stand for the separate proposition that AEDPA requires courts to apply a second analytical framework after applying *Brecht*. *See Jenkins*, 814 F.3d at 985 (discussing *Ayala* and concluding "[a] separate AEDPA/*Chapman* determination is not required"). The dissent, for another instance, also includes the Third Circuit on its list—and yet that court too applies a *Brecht*-only framework. *See, e.g.*, *Wharton v. Vaughn*, 722 F. App'x 268, 277 (3d Cir. 2018), *cert. denied*, 139 S. Ct. 594 (2018) ("[A]lthough the District Court reviewed [the state court's harmlessness assessment] under § 2254(d), our review here will focus on whether he has met the *Brecht* standard."). In sum, this opinion does not flout AEDPA or misapprehend Supreme Court precedent, dissent at

39**,** and it does respect the judgment of our sister circuits, which routinely apply a test comparable to our own.

Applying *Brecht*, we turn to cases that analyze harmlessness by assessing the weight of a shackling error in light of the evidence presented. For example, in *Robinson v. Gundy*, we held that the unconstitutional shackling was harmless error because "[t]he evidence against Robinson was truly overwhelming." 174 F. App'x 886, 893 (6th Cir. 2006). Similarly, in *Lakin v. Stine*, our circuit determined that the shackling error was harmless because "the evidence of guilt is overwhelming." 431 F.3d 959, 966 (6th Cir. 2005). These cases were preceded by *Ruimveld v. Birkett,* which held that the petitioner proved his entitlement to habeas relief by "showing the harm to the presumption of innocence that the Supreme Court has found to be inherent in indicia of guilt such as shackles, by showing that there was no good reason for the shackling, by showing that his was a close case based on purely circumstantial evidence," and by noting that the State had failed to show any factors (other than his imprisonment) that would make the shackles less prejudicial. 404 F.3d at 1017–18.

Taken together, these cases stand for the proposition that the shackling of a defendant without justification is highly prejudicial if viewed by the jury because it vitiates the presumption of innocence and undermines the fairness of the factfinding process. Indeed, the Supreme Court in *Deck* instructed that "shackling is 'inherently prejudicial.'" *Deck*, 544 U.S. at 635 (quoting *Holbrook*, 475 U.S. at 568). The dissent mistakenly views the Supreme Court's conclusion as limited to direct review. Dissent at 43. Of course, in Davenport's habeas case, unlike Deck's direct appeal, actual prejudice is a prerequisite to relief. *Deck*, 544 U.S. at 635. That is precisely *our* position in the disagreement with the dissent over the standard of review. But the "inherently prejudicial" nature of visible shackling, as determined by the Supreme Court, does not rise and fall with the standard of review. Instead, as the Supreme Court itself explained, "[t]hat statement is rooted in our belief that the practice will often have negative effects, but— like 'the consequences of compelling a defendant to wear prison clothing' or of forcing him to stand trial while medicated—those effects 'cannot be shown from a trial transcript.'" *Id.* (quoting *Riggins v. Nevada*, 504 U.S. 127, 137 (1992)).

The governing caselaw reveals *Brecht*'s "actual prejudice" standard in action. AEDPA/*Chapman* and *Brecht* provide two mechanisms for assessing harmless error. *Brecht*'s is "broader." *Ruelas*, 580 F.3d at 412. While error found under *Brecht* necessarily means error under AEDPA/*Chapman*, the opposite cannot be said. As the Eleventh Circuit (another court included by the dissent on its list) correctly explained, "if a petitioner satisfies the *Brecht* standard, he necessarily also satisfies the AEDPA standard, though the reverse is not true." *Hammonds v. Comm'r, Alabama Dep't of Corr.*, 712 F. App'x 841, 850 (11th Cir. 2017), *cert. denied sub nom. Hammonds v. Dunn*, 139 S. Ct. 106 (2018) (citation omitted).[9] By this same token, if a petitioner cannot prevail under AEDPA/*Chapman*, he cannot prevail under *Brecht*. *Id.* This is why courts, including this one—and many on the dissent's list—often test the waters under AEDPA/*Chapman* before turning to *Brecht*'s more demanding inquiry. *See Stewart v. Trierweiler*, 867 F.3d 633, 636–38 (6th Cir. 2017).[10]

The dissent's misunderstanding of this point is yet again illustrated by the case it holds up as "particularly instructive." Dissent at 37. In *Malone v. Carpenter*, the Tenth Circuit interpreted *Ayala*'s instruction that "although a federal court reviewing a state [court merits decision under *Chapman*] need not 'formally apply both *Brecht* and AEDPA,' AEDPA still 'sets forth a precondition to the grant of habeas relief.'" 911 F.3d at 1030 (quoting *Ayala*, 135 S. Ct. at 2198). The *Malone* Court continued: "as we understand the Court, satisfaction of the AEDPA/*Chapman* standard is a *necessary* condition for relief (that is, failure to satisfy the standard requires denial of relief), but satisfaction of the standard is not a *sufficient* condition for relief because *Brecht* must also be satisfied." *Id.* (emphasis in original)).

*Malone* did not say, nor could it, that satisfaction of the *Brecht* standard (which incorporates AEDPA/*Chapman*) is not a sufficient condition for relief. It is. The Supreme Court has said so. *Ayala*, 135 S. Ct. at 2198–99. Though courts may choose to apply both, *see*

---

[9]*Hammonds* also noted: "[t]he majority of the federal courts of appeals directly apply the *Brecht* test rather than first determining whether a petitioner meets the AEDPA standard." *Hammonds v. Comm'r, Alabama Dep't of Corr.*, 712 F. App'x 841, 850 (11th Cir. 2017), *cert. denied sub nom. Hammonds v. Dunn*, 139 S. Ct. 106 (2018).

[10]The dissent cites *Stewart* as an emblem of proper harmless error analysis at the habeas stage. But there the petitioner failed to get past AEDPA/*Chapman* and we affirmed on that issue; there was no reason to reach *Brecht*. *Id.* at 638. The *Brecht*-only approach taken here fully accords with *Stewart*.

*Malone*, 911 F.3d at 1037; *Ayala*, 135 S. Ct. at 2208, it is not necessary. *Id.* at 2198–99. And since *Malone*, the Tenth Circuit has evidenced its agreement with that principle by applying a *Brecht*-only framework. In *Harmon v. Sharp*, for example, it held: "[o]n habeas review, we may only hold that a constitutional error was not harmless if, after applying de novo review, we determine that the error 'had substantial and injurious effect or influence in determining the jury's verdict,'" 936 F.3d 1044, 1081 (10th Cir. 2019) (quoting *Brecht*, 507 U.S. at 637; citing *Ayala*, 135 S. Ct. at 2198). And contrary to the position taken by the dissent, *Harmon* did not otherwise apply an AEDPA/*Chapman* test to the harmlessness analysis performed by the state court. *Id.*; *see also Harmon v. State*, 248 P.3d 918, 933 (Okla. Crim. App. 2011) (applying *Chapman*). In *Coddington v. Sharp*, the Tenth Circuit ratified its conclusion that *Brecht* necessarily includes an assessment of whether the state court's "harmlessness determination was itself unreasonable." 959 F.3d 947, 953, 957 (10th Cir. 2020) (quoting *Ayala*, 135 S. Ct. at 2199).

The dissent does not—and cannot—cite a single court of appeals case where a habeas petitioner would have prevailed under *Brecht* but then lost under AEDPA/*Chapman*. The circuit court cases it cites merely reveal how the application of *Brecht* satisfies AEDPA/*Chapman*. Some of the cases cited by the dissent begin with AEDPA/*Chapman*, and only get to *Brecht* if necessary; others on its list—as specifically authorized by the Supreme Court—go straight to *Brecht*. No case on the dissent's list completes *Brecht*'s harmless error inquiry only to repeat the analysis under a different test.

Applying the *Brecht* standard set out by the Supreme Court and employed in our circuit, we examine the strength of the evidence against Davenport.

## C. Substantial and Injurious Effect or Influence

### 1. Evidence of Guilt

The State argues that the evidence Davenport committed some degree of murder was overwhelming. Davenport conceded that he killed White but argued that he did so in self-defense. Yet unrebutted expert testimony explaining that strangulation requires several minutes to kill is inconsistent with his self-defense claim. On the other hand, the evidence showing the

premeditation and deliberation required for first-degree murder is considerably weaker. To resolve the core dispute in this case, it is necessary to delve briefly into the Michigan caselaw that governs.

Michigan law draws a sharp distinction between first-degree and second-degree murder. "First-degree and second-degree murder are separate offenses, carrying vastly different penalties, distinguished only by the requirement that a homicide punishable as first-degree murder be committed with premeditation and deliberation." *People v. Morrin*, 187 N.W.2d 434, 448–49 (Mich. Ct. App. 1971); *see also* Mich. Crim. J.I. 16.6 (comparing the elements of first-degree and second-degree murder).[11] For this reason, "premeditation and deliberation must be given independent meaning in a prosecution for first-degree murder." *Morrin*, 187 N.W.2d at 449. The "legislative classification of murder into two degrees would be meaningless if 'deliberation' and 'premeditation' were construed as requiring no more reflection than may be involved in the mere formation of a specific intent to kill." *People v. Hoffmeister*, 229 N.W.2d 305, 307 (Mich. 1975) (quoting *People v. Anderson*, 447 P.2d 942, 948 (Cal. 1968)). On the contrary, the use of the terms "deliberate" and "premeditated" denotes that first-degree murder requires "substantially more reflection on and comprehension of the nature of the act than the mere amount of thought necessary to form the intent to kill." *People v. Plummer*, 581 N.W.2d 753, 757 (Mich. Ct. App. 1998).

Michigan caselaw reveals two prerequisites for a finding of premeditation and deliberation. First, "[w]hile the minimum time necessary to exercise this process is incapable of exact determination, the interval between initial thought and ultimate action should be long enough to afford a reasonable man time to subject the nature of his response to a second look." *People v. Tilley*, 273 N.W.2d 471, 473–74 (Mich. 1979) (quoting *People v. Vail*, 227 N.W.2d 535 (1975)). And, second, there must be evidence that the defendant had—and took—a moment for calm reflection before the murder: "[W]hen a homicide occurs during a sudden affray . . . it would be 'a perversion of terms to apply the term deliberate to any act which is done on a sudden

---

[11]*Compare* Mich. Comp. Laws Ann. § 750.316 (first-degree murder), *with id.* § 750.317 (second-degree murder). Though there are other types of first-degree murder under Michigan law, such as felony murder or murder of a law enforcement officer, Davenport was accused only of first-degree murder involving a "deliberate, and premeditated killing." *Id.* § 750.316(a).

impulse.'" *Id.* at 473 (quoting *Nye v. People*, 35 Mich. 16, 19 (1876)). Thus, "[w]hen the evidence establishes a fight and then a killing, there must be a showing of 'a thought process undisturbed by hot blood' . . . . The critical inquiry is not only whether the defendant had the time to premeditate, but also whether he had the *capacity* to do so." *Plummer*, 581 N.W.2d at 757 (quoting *Morrin*, 187 N.W.2d at 449); *accord* 3A *Gillespie Mich. Crim. L. & Proc*. § 91:12 (2d ed. 2020). For these reasons, the Michigan Supreme Court has held that the mere fact that a defendant repeatedly stabbed the decedent, inflicting "a great many wounds," was insufficient evidence of premeditation and deliberation to support a conviction for first-degree murder. *Hoffmeister*, 229 N.W.2d at 307–08. The court concluded: "There is no basis on this record for an inference that between the successive, potentially lethal blows the killer calmly, in a cool state of mind, 'measured and evaluated' and subjected 'the nature of his response to a second look.'" *Id.* (quoting *Morrin*, 187 N.W.2d at 449).[12]

In this case, the amount of time the strangling must have taken is the only evidence of premeditation and deliberation the prosecution pointed to in its closing argument. Certainly, the duration of the strangling demonstrates the intent to kill—or at least the intent to cause great bodily harm—required for second-degree murder. *See* Mich. Crim. J.I. 16.5. But it is not definitive proof of premeditation or deliberation. "[E]vidence of manual strangulation can be used as evidence that a defendant had an opportunity to take a 'second look.'" *People v. Johnson*, 597 N.W.2d 73, 79 (Mich. 1999) (quoting *People v. Furman*, 404 N.W.2d 246, 249–50 (Mich. Ct. App. 1987)). Yet, by itself, it is not conclusive: "[N]either the brutal nature of a killing nor manual strangulation alone is sufficient to show premeditation . . . ." *Id.* That is especially true when, as here, there is substantial evidence that the strangulation occurred in the course of a fight and thus "the homicide occurred during an affray whose nature would not

---

[12]The Michigan Supreme Court recently characterized *Hoffmeister* as a case where "there was no basis for the jury to conclude that the defendant had adequate time for a 'second look'" because "the only evidence presented was the number of stab wounds." *People v. Oros*, 917 N.W.2d 559, 567 (Mich. 2018). In *Oros*, the court held that the evidence of deliberate and premeditated first-degree murder was legally sufficient because there was additional evidence besides the number of stab wounds. *Id.* at 567–70. *Oros* distinguished *Hoffmeister*; it did not overrule it. *See id.* at 570 ("Our holding is consistent with *Hoffmeister* as we do not hold today that the sheer number of stab wounds alone established the elements of premeditation and deliberation."). And without regard to *Oros, Hoffmeister* was good law at the relevant time—Davenport's trial was in 2008.

permit cool and orderly reflection." *Plummer*, 581 N.W.2d at 757 (quoting *Morrin*, 187 N.W.2d at 450).

The record contains substantial evidence that a fight took place. One witness testified that he asked White to leave his house at about 2:30 a.m. because she was "agitated" and "getting crazy" after smoking some crack cocaine. Other witnesses testified that White would get angry when she smoked crack cocaine and that she was "a spitfire" who had a reputation for fighting. Even the evidence that the State introduced of Davenport's admission that he killed White is consistent with this story: A prosecution witness testified that Davenport told him White "kept coming back at him and it just got out of hand, and that's when he offed her."

Based on the evidence presented, the only time Davenport could have engaged in the requisite period of calm reflection "undisturbed by hot blood" would have been while he was strangling White. And the only evidence of premeditation and deliberation the prosecution pointed to in its closing was the time that strangulation would have taken. Yet, under Michigan law, evidence of manual strangulation alone is not enough to prove premeditation. *Johnson*, 597 N.W.2d at 79. The jury easily could have found that this was second-degree murder, not first-degree murder, because "the homicide occurred during an affray whose nature would not permit cool and orderly reflection." *Plummer*, 581 N.W.2d at 757 (quoting *Morrin*, 187 N.W.2d at 450). The evidence of premeditation and deliberation was therefore not overwhelming.

The closeness of the case is further demonstrated by the duration of the jury's deliberations. In *Ruimveld*, we observed that the case is not "open-and-shut," giving as partial support that "the jury deliberated for over three hours despite the simple facts." 404 F.3d at 1016. This case was arguably even simpler; given that Davenport admitted killing White, the only disputed fact at trial was his state of mind, the critical component of first-degree murder. Yet the jury still deliberated for approximately six hours, through one afternoon and into the next morning.

As to the merits, the dissent dismisses the analysis of applicable Michigan cases and law as "generalities." Dissent at 45. Instead, the dissent wholly frames its argument on the "strikingly similar" case of *People vs. Johnson*, dissent at 27, which it says results in "the

inescapable conclusion" that *Johnson* brands Davenport's conduct as premeditated murder, dissent at 44. As noted above, *Johnson* does have applicability as part of the full examination of Michigan law. But employing *Johnson* requires acknowledging that review by the Michigan Supreme Court was granted solely to determine whether it was error to deny Johnson's motion for directed verdict. The question before that Court was whether there was "sufficient evidence to justify a rational tryer of fact in finding guilt beyond a reasonable doubt." *Johnson*, 597 N.W.2d at 75–76.

That is not the question we ask here. Under *Brecht*, we ask whether the constitutional violation of shackling Davenport throughout the trial had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637. It is, of course, possible that a trial record contains evidence sufficient to convict a defendant of a crime but the jury, considering that evidence and making the credibility determinations entrusted to it as the trial's factfinder, votes to acquit. We are aware of no case in which a habeas petitioner claiming a constitutional violation at trial has been required to satisfy a directed verdict standard of review in order to find that the violation was not harmless. We have held that we will not find a constitutional violation to be harmless simply because the record reflected enough evidence to support the jury's verdict. *McCarley*, 801 F.3d at 665. In fact, "[t]ime and again, the Supreme Court has emphasized that a harmless-error inquiry is not the same as a review for whether there was sufficient evidence at trial to support a verdict." *Jensen v. Clements*, 800 F.3d 892, 902 (7th Cir. 2015) (collecting cases). Even if there was "'ample evidence' to support the conviction," that would be "irrelevant" because "the question before us is not whether there was sufficient evidence to support the jury's conclusions, but rather whether the evidence is so strong that a reviewing court can be assured that the shackling did *not* affect the jury's conclusions." *Ruimveld*, 404 F.3d at 1017 n.5. Even if we were to assume that *Johnson*'s holding dictates a finding that the State introduced sufficient evidence to support conviction of Davenport, that is not sufficient to show that the unconstitutional shackling was harmless. Thus, *Johnson* provides no "inescapable conclusion" that controls this case. Dissent at 44.

2. <u>Juror Testimony</u>

In addition to arguing that this is a case of overwhelming evidence, the State tries to meet its burden of showing that the shackling did not have a substantial and injurious effect or influence on the jury's verdict by pointing to the testimony of jurors that the shackling did not affect their deliberations. The state courts also relied on this testimony in denying Davenport relief after the evidentiary hearing. But, as Davenport argues, the Supreme Court has made clear that jurors' subjective testimony about the effect shackling had on them bears little weight. If a practice "'involves such a probability that prejudice will result that it is deemed inherently lacking in due process,'" like shackling a defendant without case-specific reasons, "little stock need be placed in jurors' claims to the contrary. Even though a practice may be inherently prejudicial, jurors will not necessarily be fully conscious of the effect it will have on their attitude toward the accused." *Holbrook*, 475 U.S. at 570 (quoting *Estes v. Texas*, 381 U.S. 532, 542–43 (1965) (citations omitted). Since *Holbrook* was decided, a voluminous body of social-science research has demonstrated support for *Holbrook*'s conclusion.[13] The dissent finds this footnoted evidence to be improper on the basis that our review must be guided only by established Supreme Court law, "not abstract sociology." Dissent at 42. But it was the Supreme Court in *Holbrook* that stated the danger of relying on after-the-fact juror conclusions regarding "inherently prejudicial" actions such as shackling because jurors may be not fully aware of how such effects "their attitude toward the accused." *Holbrook*, 475 U.S. at 570. This scientific evidence merely provides further support for the Supreme Court's determination.

Moreover, two aspects of the jurors' factual testimony at the evidentiary hearing suggest that Davenport's shackling may have prejudiced his trial. First, when questioned three years after the trial, a majority of jurors still remembered that they either saw his restraints or heard

---

[13]*See generally* Jennifer L. Eberhardt, *Biased: Uncovering the Hidden Prejudice that Shapes What We See, Think, and Do* (2019). This research suggests that the shackling of Davenport, a 6'5" tall black man weighing approximately 300 pounds, would tend to "prime" racialized presumptions of dangerousness and guilt. *See, e.g.*, Mark W. Bennett & Victoria C. Plaut, *Looking Criminal and the Presumption of Dangerousness: Afrocentric Facial Features, Skin Tone, and Criminal Justice*, 51 U.C. Davis L. Rev. 745, 785 (2018) ("Repeated studies indicate Blacks with darker skin tones and stronger Afrocentric facial features 'activate automatic associations with negative behavioral stereotypes of Black men, such as aggression, violence, and criminality.'" (citations omitted)); Justin D. Levinson et al., *Guilty by Implicit Racial Bias: The Guilty/Not Guilty Implicit Association Test*, 8 Ohio St. J. Crim. L. 187, 207 (2010) ("[W]e found that participants held implicit associations between Black and Guilty. . . . [T]hese implicit associations were meaningful—they predicted judgments of the probative value of evidence.").

another juror remark on his shackles. This suggests the shackles made an impression. Second, several jurors testified that they thought Davenport might be dangerous when they saw his restraints. The dissent asserts that there is "little reason to believe" that juror testimony concerning whether Davenport was dangerous was due to his partial shackling, as opposed to the "gruesome" killing at issue in this case. Dissent at 45. This statement misreads the record; those jurors were not making a holistic assessment of whether Davenport was dangerous in light of all that they knew about him. Rather, the jurors were asked specifically whether Davenport's shackling left them with the impression that he was dangerous *at the time they observed the restraints*.

Juror James Vanderveen testified as follows:

Q:      And given that you saw the restraints at some portions of the trial, did you think that [Davenport] might be dangerous?

A:      Well I would assume that, yes.

Q:      Okay. Did you think that he had done something wrong and that is why he was shackled?

A:      Well it was a murder trial, correct?

Similarly, Juror Robert Jankford stated that he noticed the shackles during the trial and thought that the purpose of the shackles was "[s]ecurity." Mr. Jankford was then asked, "[d]id you think that he might be dangerous?" Mr. Jankford replied "[a]bsolutely." Juror Bradley Lewis described how, initially, he did not notice the shackles on Davenport, but that a different juror pointed out the shackles to him and other jurors while the jurors were sitting in the jury box during the middle of the trial.

The fact that Davenport stood charged with, and was later convicted of, a violent crime does not provide a reason to write off the jurors' explanations of their impressions concerning Davenport's shackles. If anything, they underscore the due process concerns that unconstitutional shackling raises. Leaving jurors with an impression that a defendant has already been determined to be dangerous is particularly troublesome when that defendant is charged with a crime a jury might expect a dangerous person to commit. Thus, the charges at issue in this case do not excuse the error created by the unconstitutional shackling, they exacerbate it.

That these jurors did not attribute great significance to the shackles, does not mean the shackling had no effect. As the Supreme Court has observed, shackling a defendant "almost inevitably implies to a jury, as a matter of common sense, that court authorities consider [him] a danger to the community . . . . [I]t thereby inevitably undermines the jury's ability to weigh accurately all relevant considerations . . . ." *Deck*, 544 U.S. at 633 (discussing the penalty phase of capital trials). Thus, "common sense" teaches that a defendant in shackles is in peril of being presumed dangerous rather than presumed innocent.

The Ninth Circuit relied on this logic in granting a habeas petition in a case with analogous facts. *Rhoden v. Rowland* was a case where, much like this one, "several of the jurors actually saw the shackles during the trial" and "[a]t least two jurors remember[ed] other jurors making comments to them about the shackles." 172 F.3d 633, 637 (9th Cir. 1999). As in this case, the defendant "was charged with violent crimes" and the evidence was disputed—indeed, "the jurors deliberated for over nine hours over three days." *Id.* The court concluded, "[b]ecause at least some of the jurors saw the shackles and because the shackles essentially branded Rhoden as having a violent nature in a case where his propensity for violence was the crucial issue, the shackles had 'substantial and injurious effect or influence in determining the jury's verdict' . . . ." *Id.* (quoting *Brecht*, 507 U.S. at 637). The shackling was therefore not harmless error. *Id.*

Here, similarly, the shackles branded Davenport as having a violent nature in a case where the crucial point of contention was whether he engaged in deliberate and premeditated murder. Given the closeness of this question, the number of jurors who observed the restraints, and the inherently prejudicial nature of shackling, the State has failed to carry its burden to show that the shackles did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637; *see Ruimveld*, 404 F.3d at 1018; *Rhoden*, 172 F.3d at 637.

### III. CONCLUSION

For the foregoing reasons, we **REVERSE** the district court's denial of Davenport's § 2254 petition, **GRANT** Davenport a conditional writ of habeas corpus that will result in his release from prison unless the State of Michigan commences a new trial against him within 180

days from the date of this opinion and **REMAND** the case for further proceedings consistent with this opinion.

———————————

**DISSENT**

———————————

CHAD A. READLER, Circuit Judge, dissenting.   In the federal courts, it is hard to imagine a habeas case where AEDPA (more formally known as The Antiterrorism and Effective Death Penalty Act) does not help guide our review.   Enacted by Congress in 1996, AEDPA brought meaningful change to how habeas claims are treated by the federal courts.   Short of declaring the law unconstitutional, we are bound to enforce it.   And we have, all across the habeas case-law landscape.

But in today's decision granting habeas relief, AEDPA is conspicuously absent.   As we sit in review of the Michigan courts' judgment that any error in Davenport's state court proceedings was harmless, we would naturally apply 28 U.S.C. § 2254(d)(1), as amended by AEDPA.   Yet the majority opinion fails to ask the fundamental question posed by § 2254(d)(1): Whether the Michigan courts' determination "was contrary to, or involved an unreasonable application of, clearly established Federal law"?   *Id.*

Failing to do so puts us at odds with *Davis v. Ayala*, 135 S. Ct. 2187 (2015).   *Ayala* reminds us of the two inquiries a federal habeas court must make when assessing the impact of a constitutional error in a collateral state court proceeding.   One, did the error have a "substantial and injurious effect or influence in determining the jury's verdict," the collateral review standard announced in *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)?   *Ayala*, 135 S. Ct. at 2198–99 (internal quotation marks omitted).   Two, honoring AEDPA, was the state court's "*harmlessness determination itself*" an "unreasonable application of clearly established federal law"?   *Id.* (emphasis in original).   The latter is particularly important here, when the Supreme Court has neither previously found a constitutional violation in a comparable setting nor held that a state court may not consider post-trial juror testimony in concluding that a constitutional error was harmless.   *See Deck v. Missouri*, 544 U.S. 622 (2005) (holding that the routine use of physical restraints fully visible to the jury violates due process); *Holbrook v. Flynn*, 475 U.S. 560 (1986) (addressing whether potential jurors hypothetically would be prejudiced by subsequent

courtroom security measures).  The *Brecht* inquiry may "subsume" some AEDPA requirements. *Ayala*, 135 S. Ct. at 2198.  But, *Ayala* makes clear, it does not consume them altogether.

To my eye, the majority decision entrenches us as the lone circuit to grant habeas relief from a state court judgment without applying AEDPA deference to that court's conclusion that a trial error was harmless.  In the wake of *Ayala*, every other circuit to reach the question has agreed that a habeas petitioner, before he may be granted habeas relief, must satisfy the distinct requirements of both *Brecht* and AEDPA.  We have done the same, just not today.  *See Stewart v. Trierweiler*, 867 F.3d 633, 636–37, 640 (6th Cir. 2017) (applying *Ayala* and measuring a state court's harmless error analysis against the backdrop of both *Brecht* and AEDPA before holding that the state court's harmless error determination was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement").  It may be that a federal court can *deny* habeas relief by "go[ing] straight to *Brecht*."  *Ruelas v. Wolfenbarger*, 580 F.3d 403, 413 (6th Cir. 2009); *see also Hollman v. Sprader*, 803 F. App'x 841, 843–45 (6th Cir. 2020) (denying habeas relief on AEDPA grounds after observing that a federal habeas court may choose to take a "shortcut" to *Brecht* in denying habeas relief).  But we stand alone as the only Circuit to *award* habeas relief without expressly applying the requirements of both *Brecht* and AEDPA.  *Cf. Reiner v. Woods*, 955 F.3d 549, 556–57 (6th Cir. 2020) (recognizing  a "colorable argument" that *Ruelas* and its progeny are incorrect in light of *Ayala*).

Because the majority opinion fails to employ an AEDPA analysis before granting habeas relief, because the majority opinion does not cite a Supreme Court decision contrary to the harmless error determination reached by the Michigan courts, and because the Michigan Supreme Court previously affirmed a strikingly similar first-degree murder conviction in *People v. Johnson*, 597 N.W.2d 73 (Mich. 1999), I respectfully dissent.

I.     **AEDPA Requires Federal Courts To Show Great Deference To State Court Adjudications On The Merits, Including Harmless Error Determinations.**

1.  I start with a point of agreement.    In recognition of the deference owed to a state court's judgment in a habeas posture, *Ayala*, the majority opinion, and I all agree that we employ the "actual prejudice" standard from *Brecht* in assessing the impact of a constitutional error on a

habeas petitioner's state proceeding.  Guided by the *Brecht* standard, we may grant habeas relief only where there is "grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict."  *Ayala*, 135 S. Ct. at 2198 (quoting *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995)) (internal quotation marks omitted).  In the words of *Ayala*, there "must be more than 'a reasonable probability' that the error was harmful."  *Id.* (quoting *Brecht*, 507 U.S. at 637).

But that is not all *Ayala* had to say.  The Supreme Court emphasized that AEDPA's requirements are also alive and well when it comes to collateral review of a state court's harmless error analysis.  AEDPA's standards are distinct, and they are stringent.  *Brecht* permits a habeas court to grant relief where *any* "error of federal law" had a prejudicial effect on the verdict.  AEDPA, on the other hand, permits habeas relief only where the state court reached "a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law."  28 U.S.C. § 2254(d)(1).  That is, the rare set of cases for which the "necessity to apply" an earlier rule recognized by the Supreme Court "[is] beyond doubt."  *Yarborough v. Alvarado*, 541 U.S. 652, 666 (2004).  And that deferential standard applies both to a state court's merits determination as well as its harmless error assessment.  *Ayala*, 135 S. Ct. at 2198–99.  AEDPA could thus foreclose relief even in cases in which *Brecht*'s harmless error standard is satisfied—most notably cases in which the purported prejudice is based on a ground for relief not yet clearly established by the Supreme Court.  *Yarborough*, 541 U.S. at 666.  The majority fails to consider this critical feature of AEDPA.

Compare *Ayala* to the majority opinion.  First *Ayala*.  There, the Supreme Court considered in a habeas context a state court's determination that any constitutional error in the collateral state court proceeding was harmless.  In so doing, the Supreme Court disagreed with the Ninth Circuit's conclusion that "a state court's harmlessness determination has no significance under *Brecht*."  135 S. Ct. at 2198.  Rather, a habeas petitioner, in addition to satisfying *Brecht*, must also satisfy AEDPA, which continues to set forth a precondition on the grant of habeas relief.  *Id.*  Earlier post-AEDPA cases applying *Brecht*, the Supreme Court acknowledged, may have muddied the point.  *See id.* (citing *Fry v. Pliler*, 551 U.S. 112, 120 (2007)).  But those decisions, *Ayala* explained, "would have had no possible basis for holding

. . . that *Brecht* somehow abrogates the limitation on federal habeas relief that § 2254(d) plainly sets out." 135 S. Ct. at 2198.

Honoring this precondition, *Ayala* undertook the familiar AEDPA analysis. The Supreme Court cited the standards set out in § 2254(d) and made clear that a federal court could not grant relief in this context unless the state court's decision "was contrary to or involved an unreasonable application of clearly established federal law." *Id.* It re-emphasized that the "highly deferential AEDPA standard applies," and noted that, in the harmless error context, a federal court must determine whether a state court applied Supreme Court precedent "in an objectively unreasonable manner" in denying relief to the petitioner. *Id.* at 2198–99 (internal quotation marks and citations omitted). And it concluded that habeas relief may not issue "under § 2254 unless the *harmlessness determination itself* was unreasonable." *Id.* at 2199 (internal quotation marks and citations omitted).

Now the majority opinion. Virtually all of these AEDPA standards are missing. In analyzing whether to grant habeas relief, the majority opinion barely mentions the "highly deferential AEDPA standard," instead claiming that the *Brecht* standard does all of the landmark statute's work. Invoking that AEDPA-free framework, the majority opinion ultimately pays no deference to the Michigan courts' conclusion that any error in Davenport's case was harmless. *People v. Davenport*, 832 N.W.2d 389, 390 (Mich. 2013) ("Given the substantial evidence of guilt presented at trial, we cannot conclude that there was an unacceptable risk of impermissible factors coming into play."); *People v. Davenport*, No. 306868, 2012 WL 6217134, at *2 (Mich. Ct. App. Dec. 13, 2012) (per curiam) (finding that the state trial court properly relied on juror testimony regarding prejudice and concluding that "[a]ll of the evidence indicated that the shackling did not affect the verdict in any way"). Blatantly disregarding "principles of comity, finality, and federalism" in this manner is precisely what AEDPA was crafted to avoid. *Woodford v. Garceau*, 538 U.S. 202, 206 (2003); *see also Williams v. Taylor*, 529 U.S. 362, 386 (2000) (Through AEDPA, "Congress intended federal judges to attend with the utmost care to state-court decisions . . . before concluding that those proceedings were infected by constitutional error sufficiently serious to warrant issuance of the writ.").

Compounding those conspicuous omissions, the majority opinion then fails to ask or answer whether the state court's harmless error determination was an "unreasonable application of clearly established Federal law." 28 U.S.C. § 2254(d)(1). Ordinarily, we would assess whether the Michigan courts' harmless error analysis "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Ayala*, 135 S. Ct. at 2199 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). But other than quoting the Michigan Supreme Court's holding, the majority ignores the underlying state court decisions altogether—a textbook example of acting as if "a state court's harmlessness determination has no significance under *Brecht*." *Id.* at 2198.

2. While Supreme Court precedent leads me ultimately to disagree with my friends in the majority, the majority opinion's conclusion is not without its own precedent. But it is mistaken precedent, in my mind, especially in the aftermath of *Ayala*. The notion that we need pay no deference to a state court's harmless error determination finds its roots in a line of our cases starting with *Ruelas*, 580 F.3d at 412. In a nutshell, *Ruelas* held that federal habeas courts reviewing state harmless error decisions may push aside AEDPA's stringent statutory requirements in favor of applying only *Brecht*'s "substantial and injurious effect" test. Where, one might ask, did *Ruelas* find such sweeping authority to close its eyes to an act of Congress? From one word in *Fry v. Pliler*: It "makes no sense to require formal application of both tests (AEDPA/*Chapman* and *Brecht*) when the latter obviously *subsumes* the former." *Id.* (quoting *Fry*, 551 U.S. at 120) (emphasis added). *See Chapman v. California*, 386 U.S. 18, 24 (1967). Embracing the term "subsumes," *Ruelas* concluded that the *Brecht* test fully accounts for all of AEDPA's requirements, effectively reading AEDPA out of existence on collateral harmless error review. *Ruelas*, 580 F.3d at 412.

But *Ruelas* failed to consider *Fry* in context. Unlike here, and unlike in *Ruelas*, the collateral state court decision at issue in *Fry* had not passed judgment on harmless error, meaning the Supreme Court was not reviewing a state court's harmless error analysis. *Fry* addressed a different question, namely, how to measure alleged prejudice resulting from a constitutional error in collateral proceedings when the error is first recognized on federal habeas review. 551 U.S. at 114.

To answer that question, the Supreme Court had to harmonize its prior decisions in *Chapman* and *Brecht* in the aftermath of AEDPA.  *See id.*  *Chapman* set forth the standard courts are to use in assessing constitutional error on direct review:  "[B]efore a federal constitutional error can be held harmless, the reviewing court must be able to declare a belief that it was harmless beyond a reasonable doubt."  386 U.S. at 24.  The burden of meeting this standard rests with the government.  *See id.* at 23–24.  *Brecht*, by comparison, addressed the prejudice standard federal courts are to employ after finding (or assuming) constitutional error in collateral proceedings.  It held that federal habeas relief may issue only when a constitutional error actually prejudiced the defendant, 507 U.S. at 637–38—in stark contrast to the government's burden to *disprove* such prejudice on direct review.  *Chapman*, 386 U.S. at 24.

And how did AEDPA, enacted only three years after the decision in *Brecht*, impact the interplay between *Chapman* and *Brecht*?  The petitioner in *Fry* asserted that, in the aftermath of AEDPA, federal courts were to apply in habeas proceedings the direct review standard set forth in *Chapman* through the lens of AEDPA.  In other words, the petitioner argued, AEDPA in essence replaced the actual prejudice standard under *Brecht* with a joint AEDPA/*Chapman* standard for claims under § 2254.  Adopting that joint standard, however, would have lowered the bar for state habeas petitioners in a sense by allowing federal courts to grant habeas relief from state court judgments without finding any actual prejudice to the petitioner.  That was so because *Chapman* places the burden on the government to disprove prejudice, *Chapman*, 386 U.S. at 24, rather than requiring an affirmative showing of prejudice, *Brecht*, 507 U.S. at 637.

What the *Fry* Court confronted, then, was the counterintuitive notion that AEDPA made it *easier* rather than harder for a petitioner to obtain habeas relief when measuring prejudice arising from a purported error.  Rejecting that odd result, the Supreme Court applied the more restrictive *Brecht* standard.  To hold otherwise would have allowed federal courts to "[overturn] final and presumptively correct convictions on collateral review because the State cannot prove that an error is harmless under *Chapman*."  *Id.*  In other words, *Fry* was merely heeding *Brecht*'s warning about expanding collateral review beyond carefully circumscribed limits.

But that does not mean, contrary to the understanding in *Ruelas* and today's majority opinion, that if the AEDPA/*Chapman prejudice* standard is less stringent than *Brecht*, AEDPA

does nothing at all in the harmless error context.  AEDPA, remember, does not simply articulate a prejudice standard.  It also cabins federal habeas review by preventing habeas courts from extending grounds for relief beyond those explicitly required by Supreme Court precedent, independent of any prejudice those errors may have caused.  In other words, relief under AEDPA requires more than prejudice.  It also requires habeas courts to extract concrete legal rules from Supreme Court precedent, to apply them to the letter, and not to expand them as we might on direct review.  *See Yarborough*, 541 U.S. at 666.

This fundamental AEDPA principle was front-and-center in *Yarborough*.  There, the Supreme Court reviewed the Ninth Circuit's grant of § 2254 relief based upon a violation of *Miranda v. Arizona*, 384 U.S. 436 (1966).  In awarding habeas relief, the Ninth Circuit faulted the state court for failing to consider the petitioner's age.  But age was not a factor the Supreme Court had explicitly required courts to consider in that context.  By requiring the state court to do so, the Ninth Circuit extended—rather than applied—existing law, a practice wholly inconsistent with AEDPA:  "Section 2254(d)(1) would be undermined if [federal] courts introduced rules not clearly established under the guise of extensions to existing law."  *Yarborough*, 541 U.S. at 666.  "Evaluating whether a rule application was unreasonable requires considering the rule's specificity," the Supreme Court explained.  *Id.* at 664.  The more general the rule, for example, "the more leeway courts have in reaching outcomes in case-by-case determinations."  *Id.*  But in all events, in cases warranting habeas relief, "the necessity to apply the earlier rule will be beyond doubt."  *Id.* at 666.

We followed that tailored approach in the analogous setting of *Mendoza v. Berghuis*, 544 F.3d 650 (6th Cir. 2008).  Like here, at issue there was a defendant's shackling at trial.  *Id.* at 655.  And then, as today, the relevant Supreme Court authority, for purposes of § 2254(d)(1), was *Deck*, 544 U.S. at 622.  In view of the key factual distinctions between *Mendoza* and *Deck*, "it [was] not obvious that *Deck* should be extended to the particular facts present" in *Mendoza*.  544 F.3d at 655.  AEDPA, moreover, forbids "breaking new ground on unsettled legal issues or interpreting existing caselaw to decide an open question in our jurisprudence."  *Dewald v. Wriggelsworth*, 748 F.3d 295, 300 (6th Cir. 2014) (internal quotations and citations omitted).  Accordingly, we denied habeas relief in *Mendoza*.  544 F.3d at 655.

The *Brecht* standard does not capture this critical feature of AEDPA. AEDPA requires a federal habeas court to assess whether Supreme Court precedent put a state court on notice of precise constitutional limitations. *See Yarborough*, 541 U.S. at 665. *Brecht*, on the other hand, writes largely on a clean slate. Unchecked by then-existing Supreme Court precedent, *Brecht* simply asks a federal habeas court to assess the prejudice arising from an alleged error. And that distinction can make all the difference. A habeas claim alleging a deeply prejudicial trial error may easily clear *Brecht*'s "actual prejudice" bar. But the claim may nonetheless fail AEDPA's comity-inspired requirements if the reviewing court must create new law or extend existing Supreme Court precedent to find underlying legal error, or that the error was not harmless. *Id.* at 666.

It follows that before awarding habeas relief today, we must explain why no fairminded jurist could find that the differences between this case and the Supreme Court's holdings in *Deck* (addressing shackling) and *Holbrook* (addressing whether potential jurors can fairly predict whether they will be improperly influenced by courtroom security measures), could justify a different outcome. *See Yarborough*, 541 U.S. at 663–66. Yet the majority opinion—tellingly, to my mind—simply refuses to do so. Rather than engaging in this demanding AEDPA analysis, the majority opinion brushes it aside, concluding that the AEDPA standard is "subsumed" by *Brecht*. Which begs the question: If, as the majority opinion posits, Davenport's claim passes the "significantly harder" *Brecht* test, why does the majority opinion not show its work, as the state asked us to do, in finding that AEDPA is also satisfied?

3. Any lingering confusion over whether AEDPA also applies alongside *Brecht* in the context of reviewing a state court's harmless error determination was put to rest by *Ayala*. As explained above, *Ayala* repeatedly referenced AEDPA's standards. It then applied those standards, in addition to applying the *Brecht* standard, in collaterally reviewing a state court's harmlessness determination. *See Ayala*, 135 S. Ct. at 2198–99 (noting that habeas relief may not issue "under § 2254 unless the *harmlessness determination itself* was unreasonable") (internal quotation marks and citations omitted); *see also id.* at 2207 ("The most that Ayala can establish is that reasonable minds can disagree about whether the prosecution's fears were well founded,

but this does not come close to establishing 'actual prejudice' under *Brecht*. *Nor does it meet the AEDPA standard*.") (emphasis added).

While *Ruelas*, decided six years before *Ayala*, might be excused for believing that habeas courts can dispense with AEDPA in the harmless error context, our cases that follow *Ayala* cannot. That starts with *McCarley v. Kelley*, 801 F.3d 652, 665 (6th Cir. 2015), and extends through *O'Neal v. Balcarcel*, 933 F.3d 618, 625 (6th Cir. 2019), and *Reiner*, 955 F.3d at 556–57, our most recent published opinions to follow *Ruelas*. The majority opinion holds out *Reiner* in particular as a beacon of light in the continuing post-*Ayala* march to vindicate *Ruelas*. But to do so, the majority opinion must first rewrite *Reiner*. The majority opinion quotes *Reiner* as follows: "The state argues that the Supreme Court's subsequent decision in *Davis v. Ayala* changed this dynamic . . . [t]he problem for the state is that our precedent forecloses this approach." 955 F.3d at 556–57. What, one might wonder, has the majority opinion omitted through its use of ellipsis? Only *Reiner*'s *Ayala*-inspired recognition that the state's position is a "colorable argument," but foreclosed by our Circuit precedent. *Id.* In that sense, *Reiner* confesses itself more a prisoner to our past mistakes than a proponent of them.

Confined by earlier flawed precedents, *Reiner*, like *McCarley* and *O'Neal* before it, thus merely continued our earlier error in *Ruelas*, citing that decision for the proposition that federal courts need not engage in an AEDPA analysis of a state court's harmless error conclusion because the *Brecht* test does the job by itself. That collective conclusion, it bears repeating, overlooks the fact that *Fry*—from where much of this misunderstanding emanates—was not reviewing a state court's harmless error determination, to which AEDPA would plainly apply. *See Fry*, 551 U.S. at 114 (determining the applicable standard of review when the state court "did not review [a trial error] for harmlessness" under *Chapman*). It also overlooked many passages from *Ayala* that undermine *Ruelas*. In fact, it ignored all of those in favor of one other: That "a prisoner who seeks federal habeas corpus relief must satisfy *Brecht*, and if the state court adjudicated his claim on the merits, the *Brecht* test subsumes the limitations imposed by AEDPA." *Ayala*, 135 S. Ct. at 2199. But that passage is not license to cast aside AEDPA. In fact, much the opposite. The Supreme Court there was reminding us that while the *Brecht* test always applies on collateral review, AEDPA *also* applies where, unlike in *Fry*, the state court

reaches the question of harmless error. And where an underlying state court decision concludes that any error in the petitioner's state court proceeding was harmless, the *Brecht* test, having subsumed AEDPA, takes on the additional requirements and demands in § 2254(d). *Id.* While *Brecht* in this sense may "subsume" the AEDPA analysis, nowhere has the Supreme Court declared that *Brecht consumes* AEDPA, rendering it null and void in the harmless error setting.

Nor, I might add, could the Supreme Court so easily have dispensed with AEDPA's requirements even had it desired to do so. AEDPA is a valid act of Congress. It has not been declared unconstitutional or otherwise unenforceable. It would be quite something, then, for the Supreme Court to nonetheless make that law disappear by "subsuming" it in the *Brecht* standard. *Johnson v. Lamas*, 850 F.3d 119, 133 (3d Cir. 2017) ("[T]he *Fry* Court did not hold—and would have had no possible basis for holding—that *Brecht* somehow abrogate[d] the limitation on federal habeas relief that § 2254(d) plainly sets out.") (quoting *Ayala*, 135, S. Ct. at 2198); *see also Sifuentes v. Brazelton*, 825 F.3d 506, 534 (9th Cir. 2016) (same). That is especially true when one considers that AEDPA followed *Brecht*, not the other way around. Functionally, *Brecht* could not have subsumed (or consumed) the AEDPA statute when the decision was announced. At that point, after all, the statute was still in the mind's eye.

That AEDPA amplifies the *Brecht* standard is all the more apparent when one considers that Congress legislates against the backdrop of Supreme Court decisions. *See Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 239–40 (2009) (internal quotations omitted). Noting the limitations on federal habeas review already in place following *Brecht*, Congress, through AEDPA, imposed "new requirements" on when habeas relief could be granted by a federal court. *Felker v. Turpin*, 518 U.S. 651, 662 (1996) ("Title I of the Act has changed the standards governing our consideration of habeas petitions by imposing new requirements for the granting of relief to state prisoners."). Those additional requirements "limited rather than expanded the availability of habeas relief." *Fry*, 551 U.S. at 119. Yet today, they are absent.

Shifting blame to the state for this dubious omission, and perhaps hedging its bets, the majority opinion contends (in a sentence) that the state conceded away AEDPA review of the Michigan courts' harmless error determination. But the state conceded no such thing. Both Michigan's brief and its statements at oral argument reflect the state's repeated contention that

AEDPA is not merely *Brecht*'s afterthought. Appellee Br. at 15, 28; Oral Argument at 14:10–17:34 (Michigan's counsel citing *Ayala* and arguing at length that the state court's harmless error analysis was not counter to Supreme Court precedent); *see also Reiner*, 955 F.3d at 556–57 (Michigan advocating that *Ayala* requires AEDPA review of a harmless error determination). Nor could the state concede the point away, in the context of AEDPA review. Section 2254(d)(1) requires that we give deference to a state court's decision on the merits, including any harmless error determination. And we owe that statutorily mandated deference regardless of how the state or Davenport might characterize the decision. *Langley v. Prince*, 926 F.3d 145, 162–63 & n.8 (5th Cir. 2019) (en banc) (citing *Brown v. Smith*, 551 F.3d 424, 428 n.2 (6th Cir. 2008), *abrogated on other grounds*, *Cullen v. Pinholster*, 563 U.S. 170 (2011)).

4. In view of this legislative and precedential backdrop, it is perhaps no surprise that every other federal appellate court to take up the issue post-*Ayala* has agreed that the standards articulated in both *Brecht* and AEDPA apply to a habeas court's review of a state court's harmless error analysis. By my count, at least seven other circuits have granted AEDPA deference to a state court's determination that a constitutional error was harmless:

- Second Circuit. *Orlando v. Nassau County District Attorney's Office*, 915 F.3d 113, 127 (2d Cir. 2019) ("When a state court makes a harmless error determination on direct appeal, we owe the harmlessness determination itself deference under [AEDPA].") (internal quotations and citations omitted);

- Third Circuit. *Johnson v. Lamas*, 850 F.3d 119, 136 (3d Cir. 2017) ("[W]e cannot say that the Superior Court's determination that Slaughter's statement was harmless was so lacking in justification that we should refuse to give it AEDPA deference.") (internal quotations and citations omitted); *Johnson v. Superintendent Fayette SCI*, 949 F.3d 791, 804 (3d Cir. 2020) (reviewing an "undecided issue of harmless error *de novo*" under *Brecht* and observing that a "different standard of review" augmented by AEDPA applies under *Lamas* and *Ayala* when the state court reached the question of harmlessness on the merits);

- Seventh Circuit. *Long v. Pfister*, 874 F.3d 544, 547–48 (7th Cir. 2017) (en banc) ("The Appellate Court of Illinois ruled that any error was harmless in light of the other evidence inculpating Long. *Davis v. Ayala* . . . holds that a harmless-error decision is one on the merits as § 2254(d) uses that phrase.") (internal quotations omitted); *see also id.* at 556 (Hamilton, Rovner, & Williams, JJ., dissenting) (finding that habeas relief was warranted where each harmless error inquiry was

satisfied, including whether the error was harmless under directly on-point Supreme Court precedent, consistent with AEDPA review);

- Eighth Circuit. *Davis v. Grandienard*, 828 F.3d 658, 666 (8th Cir. 2016) ("We fail to find any unreasonable application of clearly-established federal law in the Minnesota Supreme Court's decision . . . explaining that any error committed by the state trial court when it admitted the inadmissible portion of Davis's statement was harmless . . . .");

- Ninth Circuit. *Rademaker v. Paramo*, 835 F.3d 1018, 1024 (9th Cir. 2016) ("[I]t was not objectively unreasonable for the state appellate court to conclude that the evidence supported the jury's finding . . . thus rendering the charging error harmless beyond a reasonable doubt."); *see also Sifuentes*, 825 F.3d at 534;

- Tenth Circuit. *Malone v. Carpenter*, 911 F.3d 1022, 1030 (10th Cir. 2018) ("So which standard prevails—*Brecht* or § 2254(d)(1)? The Supreme Court has answered the question by saying that both apply.");

- Eleventh Circuit. *Al-Amin v. Warden*, 932 F.3d 1291, 1299 (11th Cir. 2019) ("Ultimately, for a federal court to grant habeas relief, it must be true *both* that the state court's application of the *Chapman* harmless beyond a reasonable doubt standard was objectively unreasonable *and* that the error had a substantial and injurious effect or influence on the verdict.") (emphasis in original) (internal citations and quotation marks omitted).

Of the many decisions in this uniform line of cases, *Malone* is particularly instructive. Assessing on collateral review a state court's conclusion that a constitutional error was harmless, the Tenth Circuit observed that "*Brecht* [] predated" AEDPA, and that AEDPA "limited rather than expanded the availability of habeas relief." 911 F.3d at 1029–30 (quoting *Fry*, 551 U.S. at 119). Notwithstanding the Supreme Court's observation in *Fry* that the AEDPA/*Chapman* standard may be easier to satisfy than the *Brecht* standard in some respects, the Supreme Court "d[id] not exclude the application of AEDPA in the harmless-error context." *Id.* at 1030 (citing *Ayala*, 135 S. Ct. at 2198). Accordingly, the Tenth Circuit applied AEDPA deference to the Oklahoma Court of Criminal Appeal's conclusion that any error in the petitioner's criminal proceeding was harmless. And because the petitioner failed to satisfy AEDPA, the Tenth Circuit denied relief. *Id.* at 1033 ("The OCCA's determination that the error in the voluntary-intoxication instruction was harmless was an eminently reasonable application of *Chapman*.").

Against the backdrop of this unbroken line of decisions, the majority opinion cites four cases for the proposition that other circuits in fact share our "*Brecht*-only" approach. Two of

them are unpublished, which says little when stacked next to the just-cited published decisions of those same courts. *Wharton v. Vaughn*, 722 F. App'x 268 (3d Cir. 2018); *Hammonds v. Comm'r, Ala. Dep't of Corr.*, 712 F. App'x 841 (11th Cir. 2017). And even on their own non-binding terms, those cases do not stand for the extraordinary proposition that a federal habeas court may "go straight to *Brecht* with full confidence that the AEDPA's stringent standards will also be satisfied." *Ruelas*, 580 F.3d at 413. Both *Wharton* and *Hammonds* extensively discuss the familiar AEDPA standard; they do not sweep it aside.

The same is true of the Seventh Circuit's en banc decision in *Long*. After confirming that the state court's harmless error decision was entitled to AEDPA deference, the court went on to *deny* habeas relief on the basis that there was no threshold constitutional error in the state court proceeding, meaning the court need not reach the question of harmlessness. 874 F.3d at 547–48. The en banc Seventh Circuit majority thus said nothing about *Brecht* consuming AEPDA. Nor, in fact, did the dissenters. The dissenting opinion, which believed a constitutional error had occurred, acknowledged three inquiries to assess whether that error was harmless—including measuring the error against the clearly established constitutional law at the time, the traditional AEDPA standard. *See id.* at 556.

That leaves the Ninth Circuit's decision in *Hall v. Haws*, 861 F.3d 977 (9th Cir. 2017), the lone published out-of-circuit decision granting habeas relief that the majority opinion cites to support its AEDPA-free framework. Yet even there, Judge Pregerson, writing for a fractured court, begrudgingly performed an AEDPA analysis, finding that the "California Court of Appeal's harmless error determination was objectively unreasonable." *Id.* at 992. Nor, it bears adding, does *Hall* suggest that the Ninth Circuit's earlier, controlling decisions in *Rademaker* and *Sifuentes* were wrongly decided or otherwise distinguishable.

Other than a misguided line of cases in this Court, then, the courts of appeals have universally accepted the notion that, before granting habeas relief, a federal court reviewing a state court's harmlessness determination must reach two separate conclusions: one, that the constitutional error had a substantial and injurious effect on the verdict; *and two*, that the state court's harmlessness analysis constituted an unreasonable application of clearly established federal law. The majority opinion does only the first.

* * * * *

By my tally, today's opinion flouts a long-standing federal statute, misapprehends Supreme Court precedent, and pays no respect to the independent judgment of our sister state courts—all in reversing a decision in which the magistrate judge and district court properly applied the correct statutory and precedential requirements. *Davenport v. MacLaren*, No. 1:14-cv-1012, 2016 WL 11262506, at *6 (W.D. Mich. Nov. 7, 2016). In so doing, the majority opinion divides our Circuit on the resolution of harmless error issues in the habeas context. *Stewart*, 867 F.3d at 636–37. And it sets us apart from every other circuit to have addressed the issue. This point bears repeating: No circuit, save for this one, has granted habeas relief without first finding that the underlying state court decision ran afoul of both *Brecht* and AEDPA. For these reasons, I cannot join the majority opinion. And given the recurring nature of this important question, it is my hope that some court, either our en banc court or beyond, will clarify the standard we apply in this frequent setting.

II. **Application Of The AEDPA And *Brecht* Standards Forecloses Relief To Davenport.**

Were we to apply AEDPA deference, as *Ayala* requires, we could not conclude that the Michigan courts' determination regarding harmless error constituted an objectively unreasonable application of clearly established federal law. Likewise, even accepting the majority opinion's conclusion that we may ignore AEDPA, the majority opinion fundamentally misapplies the *Brecht* standard in granting habeas relief to Davenport.

A. *In Faulting The Michigan Supreme Court On Collateral Review, The Majority Opinion Impermissibly Extends Both* Deck *and* Holbrook.

Because there is no Supreme Court precedent that shows "beyond doubt" that an error occurred in Davenport's trial or that any such error was not harmless, *Yarborough*, 541 U.S. at 666, Davenport's claim fails to clear AEDPA's high bar. *Stewart*, 867 F.3d at 639.

To assess whether the Michigan courts unreasonably applied clearly established federal law in affirming Davenport's conviction, the most analogous benchmarks are *Deck* and *Holbrook*. In *Deck*, the Supreme Court held that the shackling of a criminal defendant at trial, in

certain circumstances, is an error of constitutional magnitude subject to *Chapman* review. 544 U.S. at 635. But *Deck* is unlike today's case in ways that make the Michigan courts' decision to deny Davenport relief entirely reasonable. Consider the extreme measures employed against Deck during his state trial. His hands and feet were shackled throughout trial. The shackles were visible to the entire jury. And Deck remained shackled even during the punishment phase—where imposition of the death penalty was quite likely. The state trial court, moreover, did not hold any kind of evidentiary hearing to probe what effect (if any) the shackles might have had on the verdict.

Compare that dramatic circumstance to the facts of Davenport's trial. A significant concern driving the result in *Deck* was Deck's inability to communicate with his counsel. *Id.* at 631. Not so for Davenport. His right hand remained unshackled throughout trial, meaning he could write notes to his counsel without impediment. *Mendoza*, 544 F.3d at 654–55 (citing *Deck*, 544 U.S. at 630). Another concern was Deck's inability to participate in his defense by testifying on account of the shackles. *Id.* Davenport testified in his own defense completely unshackled. Also unlike in *Deck*, there was a privacy curtain around counsel table to make Davenport's shackles less apparent, undercutting *Deck*'s core requirement for granting relief, namely, that the shackles be visible to the jury. *Id.* These same factual distinctions led us to deny the petitioner's shackling claim in *Mendoza* because "it [was] not obvious that *Deck* should be extended to the particular facts present." *Id.* at 655. So too here.

And in another respect, Davenport's claim is an even weaker candidate for habeas relief than was Mendoza's unsuccessful claim. Back to *Deck*. There, the state trial court failed to probe any possible influence Deck's shackling had on the jury. Not so here. Following the Michigan Supreme Court's acknowledgement that Davenport's partial shackling may have been an error under *Deck*, the trial court held an evidentiary hearing to elicit testimony from the jurors to assess whether shackling had any impact on the trial's outcome. The court inquired whether the jurors had seen the shackles and, if so, what effect, if any, the shackles had on each juror's deliberation. Less than half the jurors saw the shackles. And each juror affirmatively testified that the partial shackling had no effect on her verdict.

So the majority opinion buries the lede. In summarizing the juror interviews that took place during the evidentiary hearing, the majority opinion starts with the least-revealing aspects. For instance, the majority notes that one juror asked another whether she was nervous sitting next to Davenport while he testified, an exchange that apparently reflected juror bias. But any apprehension over proximity to Davenport on the juror's part could simply reflect the fact that Davenport, at the time, was a six-foot-five-inch, 300-pound man accused of violently strangling a young woman. Only after highlighting this and other largely inconsequential items does the majority opinion finally mention the conclusive bottom line: No juror's verdict was influenced by the partial shackling.

But that bottom-line account cannot be trusted, we are told, in view of the Supreme Court's decision in *Holbrook*. *Holbrook*, however, is a poor vehicle for undermining this juror testimony. After all, *Holbrook* did not deal with shackling. Nor did it address juror reflections following trial. Rather, it addressed statements made by *prospective* jurors *during voir dire*. It may be the case that a potential juror's pre-trial statement that she will not be prejudiced by visible security measures while later sitting as a juror during trial proceedings is inherently speculative. 475 U.S. at 570 ("[W]hen jurors are questioned at the very beginning of proceedings[,] at that point, they can only speculate on how they will feel after being exposed to a practice daily over the course of a long trial."). But that hardly describes today's case. Davenport's jurors were questioned only after sitting through a lengthy trial where they heard graphic evidence of a brutal killing. When the jurors were later asked about the effect of the partial shackling on their deliberations, they were relaying their actual experiences, not speculating about future events, a distinction aptly recognized by the Michigan Court of Appeals. *Davenport*, 2012 WL 6217134, at \*2 ("[I]t was proper for the jurors to testify regarding how viewing the shackles affected their deliberations.").

Lacking a factual or legal basis to establish an unreasonable application of federal law by the Michigan courts, the majority opinion turns to legal commentators and public researchers. These sources, says the majority opinion, also undermine Davenport's conviction. Why? Because "social-science research has demonstrated the near-universal existence of implicit and unconscious bias." That may be (although the debate can be left for another day). Suffice it to

say that the majority opinion, if it proves anything, proves too much. After all, if every person to sit on a jury implicitly is impermissibly biased, seemingly no verdict could ever stand, given the risk that some purported bias may have tainted the outcome, even in the face of overwhelming evidence. For today's purposes, what guides our review is "clearly established Federal law, as determined by the Supreme Court of the United States," not abstract sociology. 28 U.S.C. § 2254(d)(1).

Plainly then, *Deck* and *Holbrook*'s application to this case was far from "beyond doubt." *Yarborough*, 541 U.S. at 666. To be sure, on direct review, a court might reasonably extend *Deck* and *Holbrook* to cover the facts of this case. But we cannot fault the Michigan courts today, on collateral review, for failing to anticipate the majority opinion's extension of *Deck* and *Holbrook*, when the Supreme Court has not done the same.

> B. *Even If* Deck *And* Holbrook *Govern Davenport's Claim, Davenport Was Not Actually Prejudiced By His Partial Shackling At Trial.*

1. Advancing "straight to *Brecht*" as the majority opinion does, it short-changes even that test. The majority opinion misconstrues the Supreme Court's holding in *Deck* and our own precedents to invoke what it calls a "presumption of prejudice." It then employs that "presumption" to shift the usual burden on collateral review, requiring a showing of "sufficiently strong evidence of guilt" to sustain Davenport's first-degree murder conviction. That unusual standard surely cannot be gleaned from *Deck*. *Deck*, keep in mind, came to the Supreme Court on direct (not collateral) review, meaning that any language there suggesting that prejudice is presumed in a shackling case can be chalked up to *Deck*'s unique procedural posture. Because of that unique posture, *Deck*'s invocation of the *Chapman* standard to measure prejudice is the inverse of what we apply here.

Nor does a "presumption of prejudice" standard fairly find its footing in our decision in *Ruimveld v. Birkett*, 404 F.3d 1006, 1017–18 (6th Cir. 2005). In *Ruimveld*, a pre-*Deck* case involving shackling, we determined that shackling claims generally are subject to harmless error review (as *Deck* would later require). *Id.* at 1013. And we acknowledged the common-sense notion that strong evidence of guilt may readily show that the defendant's shackling was harmless. *Id.* at 1016. But we did not hold that strong evidence was *necessary* to do so. In any

event, to the extent *Ruimveld* is inconsistent with *Deck*'s subsequent holding that shackling errors are subject to ordinary *Chapman* analysis (and therefore *Brecht* analysis on collateral review), *Deck* carries the day.

Not only is the majority opinion's standard at odds with precedent, it is similarly at odds with the traditional understanding of habeas review. By employing a "presumption of prejudice" standard, the majority opinion engages in what essentially amounts to direct review of the Michigan Supreme Court's decision—and a more exacting form of direct review at that—paradoxically making habeas relief easier to obtain than relief on direct review. Among other peculiarities, the majority's approach sets shackling apart from other errors subject to *Chapman* analysis. But the Supreme Court has not afforded shackling violations unique treatment. As with other constitutional errors, the state, on direct review, must prove "beyond a reasonable doubt that the [shackling] error complained of did not contribute to the verdict obtained." *Deck*, 544 U.S. at 635 (alterations and citations omitted). And when a state court concludes that the government has done so, we apply the ordinary *Brecht* analysis on collateral review. *See* 507 U.S. at 623.

Following *Brecht*, to hold on collateral review that a criminal defendant was prejudiced by a constitutional error, we must have "grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict.'" *Ayala*, 135 S. Ct. at 2198 (quoting *O'Neal*, 513 U.S. at 436). This standard, the majority opinion notes, was satisfied in *Ruimveld*, "a close case based on purely circumstantial evidence." 404 F.3d at 1017–18. Davenport's case was not close. Ample evidence supported his conviction for first-degree murder. Davenport undisputedly strangled White until she died. To do so, a medical expert explained to the jury, Davenport had to continue to apply pressure to White's airway for more than four minutes *after she lost consciousness*.

In Michigan, Davenport's conduct constitutes premeditated murder. *See People v. Johnson*, 597 N.W.2d 73, 78–80 (Mich. 1999). That is the inescapable conclusion from *Johnson*. There, the Michigan Supreme Court affirmed a first-degree murder conviction involving strangulation. In addition to the strangulation evidence implicating Johnson, the record also revealed that Johnson knew the victim, had defensive wounds, and moved the

victim's body after the killing. Collectively, this evidence satisfied the elements of first-degree murder. *Id.* at 79–80.

Compared to the record in *Johnson*, the government had evidence to spare in Davenport's case. Davenport, the record reveals, had an unfortunate fondness for strangulation. In addition to strangling White, Davenport had also strangled another woman less than a week earlier, conduct consistent with what he had told others: that he would choke people if things ever got out of hand. With respect to whether Davenport had time to take a "second look" before murdering White, Davenport (like Johnson) had defensive wounds. If all of that was not enough to prove premeditation, the government also established why Davenport strangled White, and why he had little remorse for doing so. The two had a pre-existing relationship, Davenport hid White's body after killing her, and he stole property from her apartment in the days after the murder. And what did Davenport have to say when confronted with this evidence while testifying at trial? "[I]t's not gonna help me any to tell the truth."

Measured against *Johnson*, the "substantial evidence of [Davenport's] guilt" left the Michigan courts with the firm conclusion that the government established that any error in Davenport's proceeding was harmless. *Davenport*, 832 N.W.2d at 390 ("Given the substantial evidence of guilt presented at trial, we cannot conclude that there was an unacceptable risk of impermissible factors coming into play."); *Davenport*, 2012 WL 6217134, at *2 ("All of the evidence indicated that the shackling did not affect the verdict in any way."). That should be all the more true in today's habeas setting. After all, *Ayala* requires Davenport to satisfy an even higher standard on collateral review: that we have "grave doubt" that an error substantially and injuriously influenced the verdict. 135 S. Ct. at 2197–98.

The majority opinion hardly mentions *Johnson*. Instead, it emphasizes general propositions of Michigan law, oddly elevating those generalities over the specific holding in *Johnson*. True, as a general proposition in Michigan, evidence that a murder was committed by manual strangulation, standing alone, is not enough to show premeditation. *People v. Furman*, 404 N.W.2d 246, 249–50 (Mich. App. 1987) (internal citation omitted). But death by strangulation helps support a prima facie case of premeditated murder. *Id.* And that prima facie case, in turn, can be supplemented by other evidence to show premeditation beyond a reasonable

doubt, as was the case in *Johnson*. 597 N.W.2d at 78–80. Here, the supplemental evidence showing premeditation was plentiful. Indeed, *Johnson* was the harder case.

2. Which brings me to the evidence regarding Davenport's partial shackling, the lone potential ground for distinguishing *Johnson*. The majority opinion posits that the partial shackling "branded Davenport as having a violent nature," so much so that his "presumption of innocence [was] replaced by a presumption of dangerousness." All of that, however, belies the Supreme Court's clear command that shackling errors are subject to ordinary *Chapman* (and therefore *Brecht*) analysis. *Deck*, 544 U.S. at 635.

In effect, the majority opinion assumes the jurors in Davenport's case were influenced in their verdict by the partial shackling. But why make any assumptions about what was going through each juror's mind during deliberations? We have their testimony. And it is conclusive. Every single juror testified that the shackling had no effect on the verdict.

To be sure, some jurors made statements to the effect that Davenport was dangerous. Of course, those statements were made after the jurors had heard graphic evidence regarding Davenport's strangulation of White—with his bare hands—along with other incriminating evidence. And, of course, after the jurors had deemed Davenport guilty of first-degree murder. That leaves little reason to believe the jurors' judgment of Davenport was due to his partial shackling (visible to less than half the jurors) rather than his gruesome killing of White.

The record is conclusive. The jury was presented with extensive evidence that Davenport strangled a woman to death, and that the crime was premeditated. Each juror testified that the partial shackling had no effect on her verdict. That evidence was enough to satisfy a unanimous Michigan Court of Appeals, and enough for a unanimous Michigan Supreme Court. It was enough for the district court and the magistrate judge. And it is enough for me. I respectfully dissent.